# EXHIBIT 4

*Execution Version*

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("**Agreement**"), effective as of the Effective Date (as defined below), is by and between Wells Fargo Insurance Services USA, Inc., a North Carolina corporation (the "**Company**"), and Michael Rockman ("**Producer**"). The Company and Producer are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

### RECITALS

WHEREAS, pursuant to that certain Stock Purchase Agreement (the "**Purchase Agreement**") by and between USI Insurance Services LLC, a Delaware limited liability company ("**USI LLC**") and Wells Fargo & Company, a Delaware corporation ("**Seller**"), USI LLC will purchase from Seller all of the issued and outstanding shares of capital stock of ACO Brokerage Holdings Corporation, a Delaware corporation ("**ACO**"); and

WHEREAS, ACO owns, directly or indirectly, all of the issued and outstanding equity interests of the Company; and

WHEREAS, contingent upon the closing of the transactions contemplated by the Purchase Agreement (the "**Closing**"), and provided this Agreement is accepted in full by Producer, the Company desires to employ Producer on the terms and conditions herein and Producer is willing to accept employment on such terms and conditions; and

WHEREAS, Producer's covenants herein are a material inducement for the Company to enter into this Agreement; and

WHEREAS, Producer acknowledges and agrees that by virtue of employment with the Company, Producer will receive a direct financial benefit and other good and valuable consideration; and

WHEREAS, Producer hereby acknowledges and agrees that the Retention Payment (as defined below) is a separate and additional payment to which Producer is not otherwise entitled and constitutes material and sufficient consideration to induce Producer to enter into this Agreement; and

WHEREAS, by virtue of past employment with the Company or any Predecessor and future employment with the Company, Producer:

(a) had, has, and will continue to have, as applicable, access to, and has gained and will continue to gain knowledge of, Confidential Information of the Company, any Predecessor and/or any USI Company, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company or any USI Company; and

**EXHIBIT MR-1**

(b) had, has, and will have, as applicable, significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to certain of the Company's customers and suppliers and, as such, has developed, will continue to develop, or will develop close and direct relationships with such customers and suppliers; and

(c) has developed, will continue to develop and/or will develop, as applicable, close and direct relationships with the officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations of the Company or any USI Company; and

(d) has benefitted, will continue to benefit and/or will benefit, as applicable, from the Company's investment of time, money and trust in Producer and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, had, has, and will continue to have, the ability to harm or threaten the Company's legitimate business interests; and

(e) has made use of, and will continue to make use of, Producer's significant skills, training and experience; and

(f) for these and other reasons, will render services to the Company that Producer acknowledges are special, unique or extraordinary; and

WHEREAS, Producer acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests; and

NOW THEREFORE, in consideration of the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, including Producer's employment with the Company, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

**AGREEMENT**

1. **DEFINITIONS.** Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

Michael Rockman
Producer -- SALES EXEC 3
(NY) 2016v1

2 of 19

FRE 408 Mediation Production

MR 6

(a) **"Active Prospective Client"** means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Producer's employment hereunder.

(b) **"Cause"** shall mean (i) commission by Producer of a willful and material act of dishonesty in the course of Producer's duties hereunder; (ii) conviction of Producer by a court of competent jurisdiction of a crime constituting a felony or conviction in respect of any act involving fraud, dishonesty or moral turpitude; (iii) Producer's performance under the influence of illegal drugs or the abuse of legal drugs, or continued habitual intoxication, during working hours, after the Company shall have provided notice to Producer and given Producer 30 days within which to commence rehabilitation with respect thereto, and Producer shall have failed to commence such rehabilitation or continued to perform under the influence after such rehabilitation; (iv) frequent or extended, and unjustifiable (not as a result of incapacity or disability) absenteeism which shall not have been cured within 30 days after the Company shall have advised Producer of its intention to terminate Producer's employment for Cause, in the event such condition shall not have been cured; (v) Producer's personal, willful and continuing misconduct or gross negligence that is injurious to the Company's reputation or business; (vi) refusal to perform duties and responsibilities described in this Agreement (or as they may be assigned from time to time), or to carry out reasonable and lawful directives of the Regional CEO or such Regional CEO's designee, including with respect to execution of any material policy; in each case which, if capable of being cured, shall not have been cured within 60 days after the Company shall have advised Producer of its intention to terminate Producer's employment for Cause; or (vii) material non-compliance with the terms of this Agreement.

(c) **"Client Account"** means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.

(d) **"Coded to Producer"** means all policies and other business coded to Producer, as determined in good faith by the Company based on standards generally used in the insurance industry. In the event of a dispute it shall be the Company's sole and absolute discretion to determine the coding attributable to Producer.

(e) **"Competitive Business"** means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

3 of 19

FRE 408 Mediation Production

MR 7

a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(f) **"Competitive Product"** means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Producer or the Company has sold, marketed, distributed or developed in the last two (2) years of Producer's employment with the Company, or about which Producer has acquired Confidential Information.

(g) **"Confidential Information"** means at any date, any information of the Company, any Predecessor and/or a USI Company to which Producer has access, that is not already generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi) the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof; (vii) the information that is password-protected; (viii) all internal memoranda and other office records, including electronic and data processing files and records; (ix) any and all other proprietary information of the Company, any Predecessor or a USI Company, including any information contained within a proprietary database; and (x) any and all other information that constitutes a trade secret under applicable law.

(h) **"Effective Date"** means the Closing date.

(i) **"Goodwill"** means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment in repeated contacts,

**Michael Rockman**
Producer -- SALES EXEC 3
(NY) 2016v1

4 of 19

FRE 408 Mediation Production

MR 8

business transactions, Confidential Information, or other efforts to develop lasting relationships.

(j) **"Net Commissions and Fees"** means all commissions and fees received and actually collected by the Company, specifically on a policy Coded to Producer, less payments to external service providers such as, but not limited to vendors and value-added service providers, and/or to other USI Companies, and any sponsorships and/or charitable contributions made to a client by the Company, unless otherwise provided for by local USI practice. "Net Commissions and Fees" shall not include any overrides or profit-sharing; interest on premiums on deposit; or contingent, bonus, excess, supplemental, non-standard, annually computed, non-specific volume based, or any other similar commissions or fees.

(k) **"New"** means any policy lines of coverage for a new client or any new policy lines of coverage for an existing client written by the Company or the other USI Companies, as the case may be. New will not encompass any client for which similar coverage was "In-Force" in the previous twelve (12) months and such business will be considered Renewal business. For policies with a coverage period of more than twelve (12) months, New shall be determined by the Company in accordance with the Company's policies in effect at such time.

(l) **"Person"** means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(m) **"Predecessor"** means any Person, in its capacity as predecessor-in-interest to the assets of the Company.

(n) **"Producer's Book of Business"** means the annual Net Commissions and Fees received by the Company on Client Accounts Coded to Producer.

(o) **"Renewal"** means the second and any subsequent year of any New coverage. For policies with a coverage period of more than twelve (12) months, Renewal shall be determined by the Company in accordance with the Company's policies in effect at such time.

(p) **"USI Business"** means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(q) **"USI Companies"** or **"USI Company"** means USI Advantage Corp., a Delaware corporation ("USI"), its subsidiaries (including USI LLC and the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

5 of 19

FRE 408 Mediation Production

MR 9

any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

## 2. POSITION, RESPONSIBILITIES AND TERM

2.1. **Position and Responsibilities.** On the terms and conditions in this Agreement, and conditioned upon the Closing, the Company shall employ Producer as a producer for the Company. Producer shall perform all services and duties customarily attendant to such position, including the goals outlined in any applicable Producer expectation form, as amended from time to time, and such other services and duties commensurate with such position as prescribed from time to time by Producer's Regional Chief Executive Officer or his/her designee (hereinafter, the "**Regional CEO**"), provided, however, Producer will not be subject to the same New business goals and expectations of a producer for the Company. Nothing in this Agreement shall confer upon Producer any right to continued employment hereunder or interfere with the Company's right to change the terms and conditions of Producer's employment hereunder.

2.2. **Insurance Licenses.** Producer shall obtain and retain the proper licenses for all lines of insurance solicited and serviced by Producer. Notwithstanding anything to the contrary in this Agreement, Producer acknowledges Producer is not entitled to any commissions for sales or servicing of policies within a line of insurance if Producer is not properly licensed for such line of insurance.

2.3. **No Conflicts of Interest.** During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Producer's employment with the Company. Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

2.4. **Duty of Loyalty.** Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of any USI Company.

2.5. **Term.** This Agreement, including Producer's employment hereunder, shall commence on the Effective Date and continue until terminated pursuant to Section 8 (the "**Term**").

## 3. COMPENSATION AND BENEFITS

3.1. **Draw.** The Company agrees to pay Producer commissions, calculated pursuant to Section 3.2, and a recoverable draw against such future commissions in an amount determined by the Company based on Producer's Book of Business ("**Draw**"); provided, however, that the Company may adjust Producer's Draw upward or downward in its discretion to fairly reflect the commissions Producer will likely earn based on Producer's

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

6 of 19

FRE 408 Mediation Production

MR 10

Book of Business. The Draw shall be offset by commissions earned by Producer pursuant to this Agreement. The Draw will be payable in equal installments by the Company (or another USI Company designated by the Company) according to its normal payroll practices.

3.2. **Calculation of Commissions.** The Company agrees to pay Producer commissions calculated in accordance with the following policies:

(a) Twenty percent (20%) of annual Net Commissions and Fees received by the Company on Client Accounts for New policies, subject to Section 3.2(e) below, assigned and Coded to Producer as the sole originating/selling and sole servicing producer in accordance with the Company's producer compensation policies. For the avoidance of doubt, Producer shall not be paid commissions for New policies on accounts below the account minimums set forth in Section 3.2(e) below.

(b) Twenty percent (20%) of annual Net Commissions and Fees received by the Company on Client Accounts for Renewal policies (and zero percent (0%) on Renewals of personal lines policies), subject to Section 3.2(e) below, assigned and Coded to Producer as the sole originating/selling and sole servicing producer in accordance with the Company's producer compensation policies. For the avoidance of doubt, Producer shall not be paid commissions for (i) Renewal policies on personal lines policies or (ii) accounts that fall below the account minimums set forth in Section 3.2(e) below.

(c) An amount determined on a case by case basis by the Company for Client Accounts where a substantial portion of fee based revenue is attributable in whole or part to Producer's efforts as an originating/selling or servicing producer.

(d) An amount determined by the Company's policies then in effect on Client Accounts, including cross-sold business and transferred business, for which Producer is not both the sole originating/selling producer and the sole servicing producer.

(e) No commission will be paid on Client Accounts Coded to Producer that generate annual Net Commissions and Fees of less than Ten Thousand Dollars ($10,000) on commercial property and casualty, or Ten Thousand Dollars ($10,000) on employee benefits. There shall be no account minimum on surety products.

(f) Producer's commissions shall be reduced by payments to co-brokers, sub-brokers, and sub-producers (including commissions and fees), referral fees, and return commissions, so that the Company's total payments to all Persons from the Net Commissions and Fees do not exceed any applicable maximum commission percentages under Company policy as amended from time to time.

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

7 of 19

FRE 408 Mediation Production

MR 11

(g) Producer's commissions shall be reduced by, and Producer shall have an ongoing duty to return to the Company, any commissions previously paid to Producer on premiums or fees subsequently refunded or not collected by the Company. Producer shall be subject to any Company policies regarding charges to and/or deductions from commissions in effect at the time such commissions are determined. Producer shall also be subject to any Company policies, as amended from time to time, regarding bad debts and write-offs from clients that require reimbursement from Producer.

(h) Producer's commissions shall not be considered earned until all charges and/or deductions have been made pursuant to this Agreement and the Company's compensation policies. In addition, such commissions only become earned by Producer if: (i) the business transaction is completed during Producer's employment hereunder; and (ii) Producer is still employed hereunder on the date the Company receives such commissions.

3.3. **Payment of Commissions.** The Company shall calculate, no less often than quarterly, commissions earned by Producer and received by the Company. Earned commissions shall be offset against: (a) Producer's Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of Producer's expense allowance. Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after each quarter. If Producer's Draw and any other applicable offsets for such period exceed Producer's earned commissions, such shortfall may be offset against installments of Producer's Retention Payment under Section 4 and/or installments of Producer's Draw for subsequent quarters and Producer's Draw for the subsequent quarter may be reduced commensurate with current earned commission levels to minimize the risk of a shortfall in the new period.

3.4. **Commissions Upon Termination.** Producer acknowledges that Producer shall not be eligible to earn or receive any commissions received by the Company after Producer is no longer employed hereunder because Producer will no longer be performing the essential duties of Producer's position which form the basis for such compensation. Accordingly, if Producer's employment hereunder is terminated for any reason, including death, the Company shall calculate commissions earned by Producer and received by the Company prior to Producer's termination. Earned commissions shall be offset against: (a) Producer's Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of Producer's expense allowance. Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after the effective date of Producer's termination. No further commissions shall be due or payable after such payment. If Producer's Draw and any other applicable offsets for such period exceed Producer's

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

8 of 19

FRE 408 Mediation Production

MR 12

earned commissions, such shortfall shall be due and payable to the Company within sixty (60) days after the effective date of Producer's termination.

3.5. **Right to Modify.** The Company may modify the policies and terms in Section 3 by giving at least thirty (30) days written notice to Producer, provided, however, that the Company may not modify the commission percentages set forth in Section 3.2(a) and 3.2(b) prior to the end of the Measurement Period without Producer's consent. For the avoidance of doubt, the Company may modify any commission percentages following the end of the Measurement Period. Producer's continued employment hereunder following any change shall be considered sufficient consideration for, and acceptance of, such change.

3.6. **Tax Withholding.** The Company shall deduct from all payments and benefits under this Agreement any taxes required to be withheld and/or paid pursuant to federal, state and local taxing authorities.

3.7. **Benefits.** Producer shall be entitled to benefits, other than paid time off, on the same terms generally provided to similar employees of the Company. Notwithstanding the foregoing, nothing contained in this Agreement shall require the Company to establish, maintain or continue any of the benefit plans already in existence or hereafter adopted for producers of the Company, or restrict the right of the Company to amend, modify or terminate such benefit plans.

3.8. **Paid Time Off.** Producer shall not accrue or be entitled to any paid time off ("**PTO**") under this Agreement or the Company's PTO policy.

4. **RETENTION BONUS PAYMENT.** Producer shall be eligible for a special retention bonus payment (the "**Retention Payment**").

    4.1. **Amount.** The amount of the Retention Payment shall be equal to ninety percent (90%) of the average annual Net Commissions and Fees received by the Company (subject to the exceptions set forth at the end of this Section 4.1) in each case, for Client Accounts assigned and Coded to Producer as the sole originating/selling and sole servicing employee during each of (a) the period beginning on the first anniversary of the Effective Date and ending one (1) day prior to the second anniversary of the Effective Date, (b) the period beginning on the second anniversary of the Effective Date and ending one (1) day prior to the third anniversary of the Effective Date and (c) the period beginning on the third anniversary of the Effective Date and ending one (1) day prior to the fourth anniversary of the Effective Date (collectively, the "**Measurement Period**"). By way of example, if the Effective Date is December 1, 2017, and Net Commissions and Fees in Producer's book of business (subject to the exceptions set forth at the end of this Section 4.1) are $900,000 for the year beginning December 1, 2018 and ending November 30, 2019 $1,000,000 for the year beginning December 1, 2019 and ending

Michael Rockman  
Producer – SALES EXEC 3  
(NY) 2016v1

9 of 19

FRE 408 Mediation Production

MR 13

<pre>
</pre>

November 30, 2020, and $1,100,000 for the year beginning December 1, 2020 and ending November 30, 2021, the amount of the Retention Payment would be $900,000 (the average of $900,000, $1,000,000 and $1,100,000 equals $1,000,000, multiplied by ninety percent (90%) equals thereto). When calculating the Net Commissions and Fees received by the Company, the following Net Commissions and Fees shall be excluded and not counted toward the Retention Payment (i) Client Accounts transferred to Producer by the Company or a USI Company, (ii) life insurance, other heaped commission life and health insurance products, and any heaped commission property and casualty insurance products, (iii) Net Commissions and Fees for Client Accounts that do not meet the account minimums required to receive commissions as set forth in this Agreement, any amendment thereto or any modification pursuant to Section 3.5, and (iv) large, non-recurring, and unusual commissions and fees, each as reasonably determined by the Company.

4.2. **Timing and Eligibility.** The Company shall pay Producer fifty percent (50%) of the Retention Payment within forty-five (45) days following the end of the Measurement Period, and the remaining fifty percent (50%) of the Retention Payment shall be paid to Producer on the payroll date immediately following the first anniversary of the payment of the first installment. Continuing on with the example in Section 4.1 above, the first installment of $450,000 would be paid within forty-five (45) days after November 30, 2021, and the remaining installment of $450,000 would be paid on the payroll date immediately following the one (1) year anniversary of the date of payment of the first installment. If Producer's employment with the Company terminates or Producer is not actively employed on the dates the installment payments under this Section 4.2 are due, Producer shall not earn or be paid such installment. Notwithstanding the foregoing, if Producer is employed by the Company as of the last day of the Measurement Period and the Company thereafter terminates Producer's employment without Cause, or Producer's employment terminates by reason of death or disability, or if Producer becomes employed by a successor or assign of the Company, then Producer or Producer's estate shall nevertheless be eligible to receive any installment payment Producer would otherwise be eligible to receive, in accordance with the timetable set forth in this Section 4.2. For the avoidance of doubt, if (i) the Company terminates Producer's employment with Cause before or after the Measurement Period, (ii) Producer resigns or terminates employment for reasons other than death or disability after the Measurement Period, or (iii) Producer is not actively employed with the Company for any reason before the end of the Measurement Period, then in each case, Producer shall not earn or be paid any installment of the Retention Payment that Producer has not already been paid. Each installment of the Retention Payment is subject to offset as set forth in Section 3.3.

5. **EXPENSES.** During the Term, the Company shall reimburse Producer, in accordance with and subject to Company and USI policy, as amended from time to time, for expenses

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

10 of 19

FRE 408 Mediation Production

MR 14

reasonably and properly incurred by Producer in connection with the performance of Producer's duties hereunder and the conduct of the business of the Company.

6. **COMPANY PROPERTY.** Producer acknowledges and agrees all Confidential Information of the Company, including information transferred from any Predecessor under the Purchase Agreement, and/or of the USI Companies, which Producer has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Producer's employment. Producer further acknowledges and agrees that Producer has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

7. **COVENANTS**

    7.1. ***Confidential Information.*** The Company agrees to provide Producer with Confidential Information to assist Producer in the course and scope of Producer's duties. Producer acknowledges that the Company's agreement to provide this Confidential Information to Producer is in consideration for, and ancillary to, Producer's agreement to the other terms in this Agreement.

    7.2. ***Confidentiality During and Following Term.*** During the Term and for five (5) years after Producer is no longer employed hereunder, for any reason, Producer will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except: (a) in the normal course of business on behalf of any USI Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Producer shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure).

    7.3. ***Defend Trade Secrets Act Required Notice.*** Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Producer acknowledges and understands that:

    (a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

    (b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

11 of 19

FRE 408 Mediation Production

MR 15

individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

7.4. **Assignment and Ownership of Intellectual Property.** Producer acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law. To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Producer is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Producer hereby irrevocably transfers and assigns to the Company all rights, title and interest Producer may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Producer may have or acquire therein. "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Producer in whole or in part during the Term: (a) using Producer's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Producer's work for the Company.

7.5. **Non-Solicitation of Clients and Active Prospective Clients.** In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity:

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

12 of 19

FRE 408 Mediation Production

MR 16

(i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

7.6. ***Non-Acceptance / Non-Service of Clients and Active Prospective Clients.*** In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

   (a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder.

   (b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

7.7. ***Non-Interference With Employees.*** In consideration of Producer's employment with the Company, and for other good and valuable consideration, Producer agrees, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Producer worked or obtained knowledge about as a result of Producer's employment with the Company.

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

13 of 19

FRE 408 Mediation Production

MR 17

7.8. **Tolling.** Producer agrees the duration of the covenants in this Agreement shall be extended by any period of time in which Producer is in breach of any such obligations and the extended duration shall be measured from the date of the court order granting injunctive relief.

7.9. **Purpose of Restrictions.** The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Producer's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill. Producer agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

7.10. **Modification.** If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations. If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the minimum extent necessary to permit the remaining terms to be enforced. The Company may unilaterally limit the scope of these covenants.

7.11. **Independent Enforcement.** Each of the covenants in this Agreement shall be construed as an agreement independent of (i) any other agreements or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Producer against the Company or any USI Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Producer or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 7 of this Agreement. The Company shall not be barred from enforcing any of the covenants in Section 7 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Producer.

8. **TERMINATION**

   8.1. **Termination by the Company.** The Company may terminate Producer's employment hereunder by giving written notice to Producer. The termination of employment shall be effective on the date specified in such notice.

   8.2. **Termination by Producer.** Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

14 of 19

FRE 408 Mediation Production

MR 18

Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

8.3. **_Payments Upon Termination._** If Producer's employment hereunder is terminated pursuant to Section 8, the Company shall: (a) reimburse Producer for any expenses properly incurred through the date of termination pursuant to Section 5; and (b) pay Producer any earned and payable commissions through the date of termination (in excess of Producer's Draw and any other applicable offsets) pursuant to Section 3.4.

8.4. **_Miscellaneous Termination Provisions._** Upon termination of Producer's employment hereunder, Producer hereby irrevocably promises to:

(a) Immediately return to the Company any and all property of any of the USI Companies in Producer's possession or control, including electronic devices and equipment, corporate credit cards and building keys, including any and all such property acquired as a result of employment with any Predecessor.

(b) Immediately destroy or return to the Company, as directed by the Company, any and all documents, data or other materials (and all copies thereof) in Producer's possession or control, whether in written, digital or other form, which contain or refer to any Confidential Information, including any and all such materials acquired as a result of employment with any Predecessor.

(c) Not access any of the USI Companies' internal or restricted premises, records, files, databases, networks, websites, emails, voicemails, or other communications.

(d) For two (2) years after Producer is no longer employed hereunder, for any reason, provide each new employer with a copy of Section 7 of this Agreement prior to taking any position with such new employer.

(e) Subject to obligations under applicable laws and regulations, not publicly make any statements or comments that disparage the reputation of any of the USI Companies or their senior officers or directors.

9. **REMEDIES.** Producer acknowledges: (a) the services to be rendered by Producer are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Producer's breach of Section 7 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation. Accordingly, Producer agrees, if Producer violates Section 7 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

15 of 19

FRE 408 Mediation Production

MR 19

limitation, temporary injunction and permanent injunction. Producer agrees to waive any requirement for the Company to post a bond.

## 10. PRODUCER'S REPRESENTATIONS AND WARRANTIES

10.1. **Disclosure of Agreements; No Conflict.** Producer represents and warrants that Producer has supplied to the Company all agreements between Producer and any Person, other than the Company, that employed or otherwise retained Producer within the past five (5) years. Producer further represents and warrants that Producer's execution of this Agreement and performance of the duties contemplated hereunder do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Producer is bound.

10.2. **No Confidential Information.** Producer represents and warrants that Producer has not taken any confidential information from any Person that employed or otherwise retained Producer, that Producer has no such confidential information in Producer's possession or control, and that Producer will not use any such confidential information in the performance of Producer's duties hereunder.

10.3. **No Copyright Materials.** Producer represents and warrants that Producer has not taken any copyrighted materials from any Person that employed or otherwise retained Producer, that Producer has no such copyrighted materials in Producer's possession or control, and that Producer will not use any such copyrighted materials in the performance of Producer's duties hereunder.

10.4. **No Restrictive Purchase Agreements.** Except with regard to any employment agreements with the Company, Producer represents and warrants that Producer is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past ten (10) years, whether heretofore expired or not, which prevents or restricts Producer from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

10.5. **Clients of Former Employers or Entities.** Producer represents and warrants to the Company that, during any period of time in which such Producer was subject to any restrictions prohibiting Producer from competing with, or soliciting the clients, customers or business of such other organization, individual or business entity, that Producer has not made any contact with any clients of any Person that employed or otherwise retained Producer, within the past five (5) years, concerning Producer's business relationship with the Company or concerning a prospective business relationship with such client in violation of such restrictive covenant. Producer further represents and warrants that Producer will not, without prior express direction of the

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

16 of 19

FRE 408 Mediation Production

MR 20

Regional CEO, solicit any clients of any Person that employed or otherwise retained Producer, within the past five (5) years in violation of such restrictive covenant.

10.6. **Employees of Former Employers or Entities.** Producer represents and warrants that Producer has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained Producer, within the past five (5) years, concerning a prospective employment relationship with the Company.

10.7. **No Ownership Rights to Client Accounts.** Producer represents and warrants to the Company that Producer has no direct or indirect ownership rights to any Client Accounts of the Company and expressly acknowledges that the Client Accounts are owned by the Company and/or a USI Company.

11. **ENTIRE AGREEMENT.** No agreements or representations, oral or otherwise, express or implied, have been made with respect to Producer's employment hereunder except as set forth in this Agreement. This Agreement supersedes and preempts any prior oral or written understandings, agreements or representations by or between Producer and the Company or any Predecessor, including without limitation, any previous employment or other similar agreement between the Producer and the Company or any Predecessor, which may have related to the subject matter hereof in any way.

12. **AMENDMENT.** Except as set forth in Sections 3.5, 7.10, 14, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

13. **GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law.

14. **SEVERABILITY.** The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the minimum extent and in the manner necessary to render it valid, legal, and enforceable. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

15. **WAIVERS.** No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default. Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

17 of 19

FRE 408 Mediation Production

MR 21

16. **ASSIGNMENT.** Producer may not assign any rights (other than the right to receive income hereunder) under this Agreement without the prior written consent of the Company. Producer's obligations under this Agreement inure to the Company, its successors and assigns. The Company may, at any time and without Producer's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor. Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

[*Signature Page Follows*]

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1
FRE 408 Mediation Production

18 of 19

MR 22

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

| WELLS FARGO INSURANCE SERVICES USA, INC. | PRODUCER |
|---|---|
| By: _____<br>Ernest J. Newborn, II<br>Secretary | By: _____<br>Michael Rockman |

Michael Rockman
Producer – SALES EXEC 3
(NY) 2016v1

19 of 19

FRE 408 Mediation Production

MR 23