UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL ROCKMAN,

                                          Plaintiff,

                  - against -                                            19 Civ. 05997 (VEC)

USI INSURANCE SERVICES LLC, USI INSURANCE
SERVICES NATIONAL, INC., USI NORTHEAST &
EMERSON REID LLC, WELLS FARGO INSURANCE
SERVICES, USA, INC. and DOES 1-50, INCLUSIVE,

                                          Defendants.

<br>

### DEFENDANT USI INSURANCE SERVICES LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

<br>

**EPSTEIN BECKER & GREEN, P.C.**
875 Third Avenue
New York, NY 10022
Telephone:  (212) 351-4500
*Attorneys for Defendant USI Insurance Services LLC*

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 2

    A.    Rockman's Employment Agreement with USI and
           the Relevant Terms of His Compensation Arrangement ....................................... 2

    B.    The "True Up" Process for Producers
           who Receive Disability Benefits ........................................................................... 4

    C.    While Employed by USI, Rockman Worked Part-Time
           and Only Essentially Serviced One Large Client .................................................. 5

    D.    The Roles Held by the L3 Team Members ........................................................... 6

           1.    Fiore ........................................................................................................ 6

           2.    Kelly ........................................................................................................ 7

           3.    Mohindra .................................................................................................. 7

           4.    Lora ......................................................................................................... 7

    E.    USI's Loss of the L3 Account .............................................................................. 8

    F.    USI's Decision to Terminate Rockman's Employment .......................................... 8

    G.    Impact of the Loss of the L3 Account
           on the Other Members of the L3 Team ................................................................ 12

    H.    Having No Obligation to do so Under the
           Terms of the Employment  Agreement, USI
           Nevertheless Paid Rockman Additional Commissions
           Following the Termination of His Employment ................................................... 13

SUMMARY JUDGMENT STANDARD ................................................................................ 15

ARGUMENT ....................................................................................................................... 16

I.    ROCKMAN'S AGE DISCRIMINATION CLAIMS
    UNDER THE ADEA AND THE NYSHRL FAIL
    BECAUSE HE CANNOT  PROVE THAT AGE WAS
    THE 'BUT-FOR' CAUSE OF HIS TERMINATION .................................................... 16

    A.    The "But-For" Standard and Burden Shifting
           Framework Under the ADEA and NYSHRL .................................................... 16

    B.    Rockman Cannot Establish a *Prima Facie*
           Case of Age Discrimination ............................................................................ 17

           1.    USI Made Efforts to Continue Rockman's Employment ........................ 18

i

2.     USI Made Efforts to Continue the
Employment of Other L3 Team Members ................................................. 18

C.     USI Has Articulated A Legitimate, Non-Discriminatory
Reason for Rockman's Termination .................................................... 19

D.     No Evidence Would Allow a Reasonable Fact Finder to Conclude
that Age Was the "But-For" Cause of Rockman's Termination ........................... 20

II.    ROCKMAN'S AGE DISCRIMINATION CLAIM
UNDER THE NYCHRL ALSO FAILS ........................................................... 22

III.   ROCKMAN CANNOT ESTABLISH A CLAIM FOR
UNTIMELY PAYMENT OF COMMISSIONS
UNDER THE NEW YORK LABOR LAW .................................................... 22

CONCLUSION .......................................................................... 25

Firm:50183328

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)......................................................................................................15

*Arnow v. Aeroflot Russian Airlines*,
   980 F. Supp. 2d 477 (S.D.N.Y. 2013).........................................................................22

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)......................................................................................................15

*Chapotkat v. Cnty. of Rockland*,
   605 F. App'x 24 (2d Cir. 2015) ...................................................................................20

*DiGirolamo v. MetLife Grp., Inc.*,
   494 F. App'x 120 (2d Cir. 2012) .................................................................................16

*Downey v. Adloox, Inc.*,
   789 F. App'x 903 (2d Cir. 2019) .................................................................................20

*Ehrbar v. Forest Hills Hosp.*,
   131 F. Supp. 3d 5 (E.D.N.Y. 2015) .............................................................................19

*Faldetta v. Lockheed Martin Corp.*,
   No. 98 CIV. 2614 (RCC), 2000 WL 1682759 (S.D.N.Y. Nov. 9, 2000) ................18

*Fox v. N.Y.C. Dep't of Educ.*,
   No. 13-CV-3204(VEC), 2015 WL 4991878 (S.D.N.Y. Aug. 20, 2015) ..................20

*Gorzynski v. Jet Blue Airways Corp.*,
   596 F.3d 93 (2d Cir. 2010)...........................................................................................16

*Gross v. FBL Fin. Servs., Inc.*,
   557 U.S. 167 (2009)......................................................................................................17

*Hu v. UGL Servs. Unicco Operations Co.*,
   No. 13 Civ. 4251 (LGS), 2014 WL 5042150 (S.D.N.Y. Oct. 9, 2014) ............20, 21

*Jantz v. Emblem Health*,
   No. 10 Civ. 6076 (PKC), 2012 WL 370297 (S.D.N.Y. Feb. 6, 2012)....................15

*Jetter v. Knothe Corp.*,
   324 F.3d 73 (2d Cir. 2003)...........................................................................................16

Firm:50183328

*Martin v. State Univ. of N.Y.*,
   704 F. Supp. 2d 202 (E.D.N.Y. 2010) ..................................................................19

*Mattera v. JPMorgan Chase Corp.*,
   740 F. Supp. 2d 561 (S.D.N.Y. 2010)..................................................................17

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)....................................................................................16, 22

*Raspardo v. Carlone*,
   770 F.3d 97 (2d Cir. 2014)...............................................................................19

*Rodriguez v. City of New York*,
   No. 09-civ-1378 (KAM) (RER), 2011 WL 3610751
   (E.D.N.Y. Aug. 16, 2011), *aff'd*, 484 F. App'x 637 (2d Cir. 2012) ......................22

*Schnabel v. Abramson*,
   232 F.3d 83 (2d Cir. 2000).............................................................................16

*Schwartz v. York Coll.*,
   No. 06-cv-6754, 2011 WL 3667740 (E.D.N.Y. Aug. 22, 2011) ...........................21

*Shaw v. McHugh*,
   No. 12-Civ-6834 (CS), 2015 WL 1400069 (S.D.N.Y. Mar. 26, 2015) ...................19

*Sheridan v. New York Life Inv. Mgmt., LLC*,
   No. 09 Civ. 4746 (KBF), 2012 WL 474035 (S.D.N.Y. Feb. 9, 2012)..........15, 16, 17, 21

*Silva v. Peninsula Hotel*,
   509 F. Supp. 2d 364 (S.D.N.Y. 2007)..................................................................21

*Spence v. Maryland Casualty Co.*,
   995 F. 2d 1147 (2d Cir. 1993)..........................................................................16

*Stanojev v. Ebasco Servs., Inc.*,
   643 F.2d 914 (2d Cir. 1981).............................................................................18

*Teasdale v. N.Y.C. Fire Dep't, FDNY*,
   574 F. App'x 50 (2d Cir. 2014) .........................................................................22

*Weiss v. JPMorgan Chase & Co.*,
   No. 06-civ-4402, 2010 WL 114248 (S.D.N.Y. Jan. 13, 2010) ..............................22

**Rules and Statutes**

Fed. R. Civ. P. 56(a) ...............................................................................................15

N.Y. Lab. Law § 191(1)(c) ...............................................................................23, 24, 25

iv

N.Y. Lab. Law § 191(3)................................................................................................................23

N.Y. Lab. Law § 198(1-a)........................................................................................................23, 24

Firm:50183328

## PRELIMINARY STATEMENT

Plaintiff Michael Rockman, a former employee of defendant USI Insurance Services LLC ("USI" or the "Company"), alleges in his First Amended Complaint that USI (1) terminated his employment as an insurance producer on the basis of his age (80) in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), the New York State Human Rights Law, N.Y. Exec. Law § 296, *et seq.* ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL"); and (2) failed to timely pay him commissions in violation of the New York Labor Law ("NYLL") §191 and §198. (*See* Am. Compl. ("Compl."), ECF No. 35).  These claims are now ripe for summary judgment, as Rockman cannot demonstrate a genuine dispute as to any material fact suggesting that USI terminated his employment *because of his age* or failed to timely pay him commissions under the NYLL.

As for Rockman's age discrimination claims under the ADEA and the NYSHRL, he cannot meet the high bar that "but for" his age, USI would not have terminated his employment.  On the contrary, the record undeniably shows that USI terminated Rockman's employment because it lost the large client that supported virtually all of his commission-based compensation.  Indeed, Rockman's supervisor testified at her deposition that the loss of this large client was the only reason for USI's decision to terminate his employment, and USI's Chief Human Resources Officer for the Northeast Region testified at her deposition that Rockman would still be employed by USI if that large client had remained a USI account.  Thus, even under the more lenient NYCRHL, the age discrimination claim fails because no evidence shows that age was a "motivating factor" in the decision to terminate Rockman's employment.

With regard to Rockman's claim under the NYLL, he has conceded that his Employment Agreement did *not* require USI to pay him commissions following the termination of his employment because it only required USI to pay him commissions earned *and received by the*

*Company* prior to the termination of his employment.  Rockman has further admitted that the commissions which USI voluntarily paid him were received by the Company *after* the termination of his employment.  No statutory basis exists to punish USI for the good deed it did in *voluntarily* paying commissions to Rockman where it had *no contractual obligation* to do so; indeed, by its terms, the NYLL does not apply to this voluntary payment.  Accordingly, summary judgment should be entered on this claim as well.

## STATEMENT OF FACTS

### A.   Rockman's Employment Agreement with USI and the Relevant Terms of His Compensation Arrangement

USI is a leading insurance brokerage and consulting firm with regional offices throughout the United States.  (Rockman Dep. 102:14-20).[1]  In November 2017, USI acquired Wells Fargo Insurance Services USA, Inc. ("Wells Fargo Insurance") pursuant to a stock purchase agreement.  (Rockman Dep. 22:16-25; Fiore Decl. ¶ 3).[2]  Prior to the acquisition, Wells Fargo Insurance employed Rockman (he had been employed there since Wells Fargo Insurance acquired Acordia, Inc., where he had worked since 1997).  (Rockman Dep. 22:16-25, 23:3-8).  In connection with the acquisition, Rockman entered into an Employment Agreement with Wells Fargo Insurance (the "Employment Agreement"), which was contingent on its closing and provided him with a special retention bonus payment provided that he satisfied certain conditions.  (Rockman Dep. 24:8-11, 26:23 to 27:3, 27:20 to 28:10, 34:11-17, 36:25 to 37:7; Garland Decl. Ex. 4, pp. 9-10).

Following the closing, USI assumed the terms of the Employment Agreement and Rockman became employed by USI in its Manhattan location as of November 30, 2017.

---

[1] References to the transcript of Rockman's July 22, 2020 deposition, excerpts of which are attached as Exhibit 1 to the accompanying Declaration of David W. Garland, are designated as "(Rockman Dep. [page:line])."  References to exhibits attached to the Garland Declaration are designated as "(Garland Decl. Ex. __)."
[2] References to the accompanying Declaration of Denise Fiore are designated as "(Fiore Decl. ¶ __)."  References to exhibits attached to the Fiore Declaration are designated as "(Fiore Decl. Ex. __)."

Firm:50493477

(Rockman Dep. 42:7-10, 102:21-23; Fiore Decl. ¶ 4).[3]  The Employment Agreement was not amended during Rockman's tenure with USI.  (Rockman Dep. 39:4-14).  At the time that Rockman commenced employment with USI, he was 79 years old.  (Rockman Dep. 42:16-25).

The Employment Agreement set forth the terms by which USI compensated Rockman, namely the parameters for payment of a draw and calculation of commissions (he did not receive a base salary); the compensation was predicated upon the amount of business that Rockman was producing at the time.  (Rockman Dep. 42:11-15, 43:2-6, 108:13 to 109:4; Garland Decl. Ex. 4).  Specifically, Section 3.1 of the Employment Agreement, entitled "Draw," provided for USI to pay Rockman

> commissions, calculated pursuant to Section 3.2, and a recoverable draw against such future commissions in an amount determined by [USI] based on [Rockman's] Book of Business ("Draw"); provided, however, that [USI] may adjust [Rockman's] Draw upward or downward in its discretion to fairly reflect the commissions [Rockman] will likely earn based on [his] Book of Business . . .

(Garland Decl. Ex. 4, pp. 6-7).

Section 3.2 of the Employment Agreement, entitled "Calculation of Commissions," governed the calculation of commissions, and spelled out the formulaic details for the calculation of commissions to be paid to Rockman. (*Id.* at pp. 7-8).  Section 3.3, entitled  "Payment of Commissions," addressed the manner in which the Company paid out the commissions, and stated, in part, that "[e]arned commissions shall be offset against (a) [Rockman's] Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of [Rockman's] expense allowance." (*Id.* at p. 8).

The Employment Agreement, in Section 8.1, provided that USI could terminate Rockman's employment "by giving written notice to [him]" and that the "termination of employment shall be

---

[3] Section 16 of the Employment Agreement, entitled "Assignment," allowed Wells Fargo Insurance to assign the Agreement to USI without Rockman's approval.  (Garland Decl. Ex. 4, p. 18).

effective on the date specified in such notice." (*Id.* at p. 14).  Section 8.3 of the Employment

Agreement further provided that if Rockman's employment was terminated pursuant to Section 8,

that USI shall "pay [Rockman] any earned and payable commissions through the date of

termination (in excess of [his] Draw and any other applicable offsets) pursuant to Section 3.4."

(*Id.* at p. 15).

Section 3.4, entitled "Commissions Upon Termination," governed the payment of

commissions to Rockman *upon the termination of his employment*:

> [Rockman] acknowledges that [he] ***shall not be eligible to earn or receive any
> commissions received by the Company after [he] is no longer employed
> hereunder*** because [he] will no longer be performing the essential duties of [his]
> position which form the basis for such compensation. Accordingly, ***if [Rockman's]
> employment hereunder is terminated for any reason* . . . *the Company shall
> calculate commissions earned by [him] and received by the Company prior to
> [his] termination . . .*** Earned commissions in excess of . . . offsets, if any, shall be
> due and payable as soon as they can be reasonably calculated, but no later than (60)
> days after the effective date of [Rockman's] termination.

(*Id.* at p. 8) (emphasis added).  Rockman agrees that when USI terminated his employment, it did

not owe him any payment for commissions not earned *and* received by the Company before the

termination of his employment.  (Rockman Dep. 150:5-9).

## B.  The "True Up" Process for Producers who Receive Disability Benefits

During Rockman's employment with USI, the Company had a "Disability and Leave

Policy" which set forth various leave programs available to its employees, including a short-term

disability wage replacement benefit (the "Policy"). (Rockman Dep. 46:12-16, 48:7-13; Garland

Decl. Ex. 5).  A section of the Policy, entitled "Producer Disability True Up Process," set forth the

process for calculating short-term disability benefits for producers compensated by a draw, such

as Rockman, and provided, in relevant part as follows:

> Producers with Draw - Short Term Disability payments will be based on benefit
> wage, defined above, and included with commission in the normal reconciliation
> process, often known as the "true up process."

(Garland Decl. Ex. 5, p. 5).

Pursuant to the "Producer Disability True Up Process" provision of the Policy, USI treated short-term disability payments made to a producer with a draw in the same manner as a draw. (Kluxen Decl. ¶ 5).[4]  Therefore, just as earned commissions would be offset against a producer's draw pursuant to Section 8.3 of the Employment Agreement, earned commissions would likewise be offset against any short-term disability payments made to a producer with a draw during a reconciliation or "true up" process.  (*Id.*).

### C.   While Employed by USI, Rockman Worked Part-Time and Only Essentially Serviced One Large Client

Upon joining USI, Rockman worked part-time, only three days a week, servicing a book of business consisting of three clients: L3 Technologies, Inc. ("L3"), Broadcast Sports International, LLC ("BSI") and FSA, LLC ("FSA"). (Rockman Dep. 50:4-18, 52:25 to 53:18).  In that role, Rockman did not attempt to "get new business" and did not bring in any new accounts to USI during his tenure with the Company (he also had not generated a new account in all the years he had been at Wells Fargo).  (Rockman Dep. 110:6-7, 57:3 to 58:14).

As Rockman explained at his deposition, he did not view his position as "a sales role"; rather, he saw himself "in a servicing, advisory, consulting role [his] entire time" at USI. (Rockman Dep. 55:25 to 56:3). Thus, he focused on servicing and cross-selling to his existing accounts.  (Rockman Dep. 53:4-18, 54:11-19, 109:24 to 110:10; Fiore Dep. 107:5-9; Mausser Dep. 135:13-23).[5]  In contrast, insurance producers at USI typically generated revenue through the sale

---

[4] References to the accompanying Declaration of John Kluxen are designated as "(Kluxen Decl. ¶ __)."  References to exhibits attached to the Kluxen Declaration are designated as "(Kluxen Decl. Ex. __)."

[5] References to the August 3, 2020 transcript of Denise Fiore, excerpts of which are attached as Exhibit 2 to the Garland Declaration, are designated as "(Fiore Dep. [page:line])."  References to the August 6, 2020 transcript of Amy Mausser's deposition, excerpts of which are attached as Exhibit 3 to the Garland Declaration, are designated as "(Mausser Dep. [page:line])."

of insurance products to new customers, in addition to maintaining ongoing relationships with existing customers. (Rockman Dep. 109:9 to 110:10; Mausser Dep. 27:14-24, 126:2-11).

USI provided L3 with a broad spectrum of health and welfare benefit consulting, brokerage and administrative support services. (Rockman Dep. 94:4-11). The USI team servicing the L3 account consisted of five members: (1) Denise Fiore, Senior Vice President and Employee Benefits Practice Leader; (2) Tom Kelly, Senior Account Executive; (3) Joanna Mohindra, Account Executive; (4) Paula Lora, Junior Account Manager; and (5) Rockman.  (Rockman Dep. 59:23 to 60:3; Fiore Dep. 49:3-9; Garland Decl. Ex. 6). The other four members of the team reported to Fiore. (Rockman Dep. 41:11-19; Fiore Dep. 85:13-23).

As a member of the L3 team, Rockman was responsible for reviewing and calculating incurred but not reported "IBNR" claims (a type of reserve account used in the insurance industry as the provision for claims and/or events that have transpired, but have not been reported to an insurance company), supporting financial reconciliation requirements and audit requests, examining incoming commissions, reviewing RFP responses, and underwriting the Aetna medical plan.  (Rockman Dep. 84:15 to 85:6, 85:15-20, 85:24 to 86:5, 89:11-24; Fiore Dep. 49:3-15; Garland Decl. Ex. 6).  In Fiore's view, Rockman's historical knowledge of L3's business and his twenty-year memory of the account, however, provided the most value to the L3 team, which he leveraged to assist Kelly and Mohindra (who had also moved to USI when it acquired Wells Fargo Insurance) in performing their hands-on, day-to-day account servicing duties.  (Fiore Decl. ¶ 5).

### D.   <u>The Roles Held by the L3 Team Members</u>

#### 1.   <u>Fiore</u>

As a Senior Vice President and Employee Benefits Practice Leader, Fiore oversaw all of the Employee Benefits teams and the accounts they serviced, including L3. (Fiore Decl. ¶ 2).  She coordinated the roles and responsibilities of the L3 team members, and made determinations with

respect to the account's staffing needs.  (Rockman Dep. 69:16 to 70:2, 71:8-13).  Rockman reported to Fiore throughout his employment with USI (Fiore had also been Rockman's supervisor during the last couple of years of his employment with Wells Fargo).  (Rockman Dep. 50:19 to 51:13, 52:11-24).

### 2.  Kelly

Kelly, a Senior Account Executive, was the lead consultant and, along with Fiore, the co-team leader of the L3 team. (Rockman Dep. 71:14 to 72:4, 112:18-21).  Among other responsibilities, Kelly was the key day-to-day contact with corporate vice presidents, employee benefits departments, vendors and human resources business units. (Rockman Dep. 72:5-14, 72:15-73:3).

### 3.  Mohindra

Mohindra, an Account Executive on the L3 team, was responsible for, among other things, preparing the monthly and quarterly financial reporting package, attending and presenting financials at L3 meetings, and conducting due diligence for mergers and acquisitions, including preparing benefit cost comparisons and after close audits for business unit consolidations. (Rockman Dep. 112:22-24, 79:11-17, 79:21 to 80:2, 80:11-19).  Unlike Rockman, who was not involved in the intricacies of the account servicing duties, and did not have an employee-facing role, Kelly and Mohindra handled the day-to-day servicing of the L3 account and regularly interfaced with the client. (Rockman Dep. 66:3 to 67:3, 72:5-11).

### 4.  Lora

Lora, as Junior Account Manager, supported the other members of the L3 team in an administrative capacity. (Rockman Dep. 112:24 to 113:3, 90:6-13). Specifically, she provided administrative support in connection with a variety of proposals, presentations, and reports. (Rockman Dep. 90:6-13, 90:14-18, 90:19-25).

Firm:50493477

### E.   USI's Loss of the L3 Account

In 2018, the L3 account, which Rockman had originated two decades earlier as an insurance producer at Acordia, was projected to generate approximately $3 million dollars of revenue.  (Rockman Dep. 53:21 to 54:10).  The BSI and FSA accounts, which were "spin-off accounts" of L3, were significantly smaller, and projected to generate revenues in 2018 only in the tens of thousands of dollars.  (Rockman Dep. 54:11 to 55:18).  On or about July 1, 2018, however, L3 notified USI that it would no longer serve as its broker of choice and, as a result, would be terminating their relationship. (Rockman Dep. 115:9-13).  Given that USI and its predecessors had been servicing the L3 account for over 20 years, the business relationship between USI and L3 needed to be wound down gradually, and USI continued for a time to perform day-to-day work on the L3 account. (Rockman Dep. 116:19-25).  USI simultaneously worked with L3 to prepare a transition plan for the formal transfer of the account to USI's successor, which was scheduled to occur on or about August 31, 2018. (Rockman Dep. 117:2-7).

### F.   USI's Decision to Terminate Rockman's Employment

In accordance with the terms of his Employment Agreement, Rockman received commissions on the revenue generated from the L3, BSI and FSA accounts. (Rockman Dep. 43:25 to 44:3, 108:13 to 109:4).  At the time his employment with USI commenced, USI set Rockman's draw at $252,651 annually, which represented approximately 80% of his estimated earnings based on commissions generated from his book of business. (Kluxen Decl. ¶ 6; Rockman Dep. 114:11-19).  Thus, Rockman's compensation depended on the approximately $3 million annual revenue from L3.  (Rockman Dep. 110:11-14).

In light of the loss of the significant L3 account, USI evaluated Rockman's compensation and future employment with the Company.  (Fiore Decl. ¶ 6; Kluxen Decl. ¶ 7).  Since Section 3.1 of the Employment Agreement (see *infra* page 3) allowed USI to "adjust [Rockman's] Draw …

Firm:50493477

downward in its discretion to fairly reflect the commissions [he was] likely [to] earn based on [his] Book of Business," on August 23, 2018, John Kluxen, Chief Financial Officer for the Northeast Region, directed Chris Heinze, a USI financial analyst, to prepare a financial analysis to determine the effect of the loss of the L3 account on Rockman's draw.  (Kluxen Decl. ¶ 8; Fiore Dep.  99:20 to 101:5, 103:3-12; Garland Decl. Ex. 7).  Following the loss of the L3 account, Rockman's draw would decrease from $252,651 to approximately $5,000 annually. (Kluxen Decl. ¶ 9, Ex. 1; Rockman Dep. 114:11-19, 121:2-21).

On August 28, 2018, Kluxen sent an e-mail, together with the draw analysis, to Amy Mausser, Chief Human Resources Officer for the Northeast Region, explaining that with the loss of the L3 account, "Rockman's draw will essentially disappear." (Mausser Dep. 9:20-24, 11:4-6; Kluxen Decl. ¶ 10; Garland Decl. Ex. 8).  Mausser, in turn, forwarded Kluxen's e-mail and draw analysis to Kim Van Orman, Senior Vice President and Chief Human Resources Officer, noting that she wanted to "get this issue on [her] radar." (Mausser Dep. 70:24 to 71:12; Garland Decl. Ex. 8).  Later that day, Fiore met with Kluxen to discuss the draw analysis prior to Fiore's addressing it with Rockman. (Fiore Decl. ¶ 7; Kluxen Decl. ¶ 10; Garland Decl. Ex. 7).

On September 7, 2018, Fiore and Mausser spoke about Rockman's status and concluded that "[w]ith L3 gone, there [was] not enough comp or work to keep [Rockman] employed."  (Fiore Dep. 64:8 to 65:8, 66:11-19; Mausser Dep. 17:12-22, 55:13 to 56:2; Garland Decl. Ex. 9).  On September 11, Fiore and Mausser met with Jim Butler, Regional Chief Executive Officer, and Robert Reers, President and Regional Practice Leader, to consider whether any realistic options existed to maintain Rockman's employment; they discussed the possibility of assigning him another book of business or trying to find a salaried staff position for him within the Employee

9

Benefits Practice.  (Fiore Dep. 74:15 to 75:14, 76:6-17, 78:7-13; Mausser Dep. 16:11-16, 24:11 to 25:5; Fiore Decl. ¶ 8).

When discussing whether Rockman could be assigned a new book of business to account for the deficit created by the loss of L3, Fiore, Mausser, Butler and Reers determined that such an assignment would be incompatible with USI's business model, which was premised on producers originating their own client accounts.  (Fiore Dep. 147:19 to 150:6; Mausser Dep. 24:21-25, 36:25 to 37:12).  While USI did not expect producers with very large books of business to generate as much new business as those producers with smaller books, the Company still expected them to be building a pipeline for the acquisition of new customers. (Mausser Dep. 27:14-24; Fiore Dep. 107:24 to 109:18, 112:3-13).  Since joining USI, Rockman had not acquired a single new client account.  (Rockman Dep. 57:3 to 58:24; Mausser Dep. 24:21-25, 25:16 to 26:18, 28:21 to 29:6, 61:4-13).

As for potentially transitioning Rockman into a salaried account executive role, Fiore and Mausser concluded that he lacked hands-on experience in the day-to-day servicing of an account required of an account executive.  (Fiore Decl. ¶ 9; Mausser Dep. 37:16 to 38:10, 39:20 to 40:7, 128:11-21, 134:11-18).  Rockman had not worked on a different account than L3 and its two spinoffs since 1996.  (Rockman Dep. 100:6 to 102:13).  Fiore understood that Rockman had not attended meetings or conference calls with HR business units, conducted enrollment meetings, participated in the implementation of new plans, created client-ready presentations, assisted with vendor resolutions, or led internal discussions regarding resource needs, data requests and reporting.  (Fiore Decl. ¶ 9).  Moreover, given that Rockman had worked primarily on the L3 account for the prior two decades, Fiore believed that his knowledge and skills were unique to that account and were not transferable to other USI accounts.  (*Id.*).

On September 11, 2018, Fiore also met with Rockman to discuss whether USI might have a suitable potential role for him.  (Rockman Dep. 121:2 to 122:13).  Rockman, too, could not identify one, and merely suggested that USI create a role for him in which he could serve as a mentor to employees starting their careers at USI.  (Rockman Dep. 123:20-25, 125:13-16).  At the end of their meeting, Rockman expressed an interest in continuing his employment with USI and Fiore replied that she would get back to him.  (Rockman Dep. 139:5-11).

Two days later, on September 13, Fiore and Rockman spoke again about USI's efforts to try to find another position for him.  (Fiore Decl. ¶ 10, Ex. 1).  That same day, Fiore received a follow-up e-mail from Rockman in which he wrote that he "would welcome the opportunity to continue with the company" and asked her to "get back to [him] as soon as possible"; Fiore replied that she would do that.  (Fiore Decl. ¶ 10, Ex. 1).  But Rockman was not generating any revenue to support a commission-based role, and USI's account management budget, which the Company was already working to reduce, could not support another salaried position. (Mausser Dep. 37:14 to 38:10, 41:21 to 42:16).  As Fiore put it at her deposition, "[t]here [were] no commissions to pay him on any accounts.  There wasn't any work for him."  (Fiore Dep. 167:6-11).

Unable to sustain Rockman's high level of compensation with the loss of the L3 account, USI determined that Rockman's employment would be terminated.  (Fiore Dep. 65:9-12; Mausser Dep. 13:5-8, 28:13-17, 56:21 to 57:3).  As Fiore testified at her deposition, the loss of L3 was the only reason for USI's decision to terminate Rockman's employment. (Fiore Dep. 65:9-14).  Mausser similarly testified at her deposition that "Mr. Rockman was let go because of the loss of L3" and "[i]f L3 was still a USI client, Mr. Rockman would still be employed." (Mausser Dep. 28:15-17).

On September 20, 2018, Fiore called Rockman to inform him of the decision. (Rockman Dep. 118:15-19; Fiore Decl. ¶ 11).  On the following day, September 21, Mausser sent Rockman an e-mail attaching a copy of the termination letter.  (Rockman Dep. 140:12-21; Garland Decl. Exs. 10 and 11).

In accordance with the terms of the Employment Agreement, the letter informed Rockman "that [his] employment relationship with the Company will terminate effective as of the close of business on October 5, 2018." (Rockman Dep. 142:18 to 143:17; Garland Decl. Ex. 11).  Mausser also reiterated in her e-mail the reason for the decision, namely that "due to the loss of [L3], there is not enough revenue to support your employment."  (Fiore Dep. 72:24 to 74:5; Garland Decl. Ex. 12).  Additionally, she confirmed that:

> Denise [Fiore] and Rob [Reers] did evaluate other opportunities within the company, however, at this time we do not have a viable position or the ability to create a position to fit your strengths.

(Fiore Dep. 74:5-14, 111:6-17; Garland Decl. Ex. 12).[6]  Accordingly, USI terminated Rockman's employment effective October 5, 2018.  (Rockman Dep. 144:3-10).

### G.      Impact of the Loss of the L3 Account on the Other Members of the L3 Team

Because of the loss of the L3 account, USI also evaluated whether the other members of Rockman's team could remain employed.   (Mausser Dep. 36:7-23). Unlike Rockman, Kelly, Mohindra and Lora were not compensated on a commission-basis; they were salaried employees. (Rockman Dep. 110:15 to 111:2, 112:11-17). While Kelly, Mohindra and Lora depended upon L3 producing revenue in terms of their job security, L3 revenue did not directly affect their compensation. (Fiore Dep. 90:20 to 91:8; Mausser Dep. 27:2-13, 33:11-22, 36:7-23).   Unlike

---

[6] In an e-mail to Van Orman on September 24, 2018, Mausser reported to Van Orman, that Rockman was unhappy with the termination decision and "asked us to find him another role," but that could not be done because "[w]e don't have a book to give him and he doesn't have any pipeline…."  (Mausser Dep. 75:7 to 76:10; Garland Decl. Ex. 13).

Rockman, who worked part-time, Kelly, Mohindra, and Lora were full-time employees. (Rockman Dep. 202:13-24).

As for Kelly, who was 59 years old at the time of Rockman's termination and in a different role, the Company decided that he would be kept on, at least in the short-term, because with the recent unexpected resignations of at least one other account executive during this period, Kelly had the hands-on experience with complex accounts necessary to take on their responsibilities; additionally, unlike Rockman, Kelly's compensation was not commission driven. (Fiore Dep. 151:15 to 152:16; Mausser Dep. 27:2-13, 33:17-22, 38:12-22, 39:6-18, 45:9-17; Garland Decl. Ex 14).

Ultimately, in late October, USI determined that Mohindra, who was 39 years old at the time of Rockman's termination, could no longer be supported with the loss of the L3 account. (Mausser Dep. 114:12 to 115:16, 120:10-14; Garland Decl. Exs. 14 and 15).   Before USI terminated Mohindra's employment, she resigned on December 7, 2018. (Fiore Dep. 87:6-20, 90:4-7; Mausser Dep. 45:18-21, 113:25 to 114:6).   Finally, given that Lora worked in an administrative capacity supporting the entire benefits department in New York City, her skills were easily transferable to other accounts, and she remained with the Company; she was 44 years old at the time of Rockman's termination.  (Fiore Dep. 86:23 to 87:5; Mausser Dep. 43:16 to 44:2, 45:22 to 46:2; Garland Decl. Ex. 15).

### H.    Having No Obligation to do so Under the Terms of the Employment Agreement, USI Nevertheless Paid Rockman Additional Commissions Following the Termination of His Employment

Pursuant to Section 3.4 of Rockman's Employment Agreement, USI was not obligated to pay Rockman any commissions received after his termination date. (*See infra* p. 4).  In the absence of any such obligation, USI decided to make an exception and to pay Rockman L3 commissions that it received after his termination date.  (Fiore Decl. ¶ 12; Garland Decl. Ex. 4).  In an e-mail to

13

Fiore on September 20, 2018, Mausser explained why USI had decided to pay Rockman additional commissions not required by the Employment Agreement:

> The issue is going to be that *his actual agreement says the money has to be earned and received prior to termination in order to be paid on it*. The region is saying *we will make an exception and pay him commissions on L3 that were earned prior, regardless of when they were received* because of the unique situation of this client; but we are not amending the entire agreement to accomplish that.

(Mausser Dep. 93:24 to 94:10; Garland Decl. Ex. 16) (emphasis added).

In Mausser's September 19 letter to Rockman (which she sent under cover of her September 21 e-mail), she set forth the expected timing of that voluntary payment and how the amount would be calculated:

> The Company has agreed to pay you for commissions earned prior to your last day. Earned commissions shall be off set against your draw for the prior periods. Earned commissions in the excess of any offsets will be payable as soon as they can be reasonably calculated, but no later than sixty (60) days after being received.

(Rockman Dep. 140:12-21, 144:18-22, 154:16-22; Garland Decl. Exs. 10 and 11).

In early 2019, USI received the balance of the delayed commission payments from L3, and it began the reconciliation, or "true up" process, to determine the amount of commissions that it had offered to pay Rockman. (Kluxen Decl. ¶ 11). Under the "Producer Disability True Up Process" set forth in the Policy, USI could have offset the commission amount by $23,443.40 which Rockman had received in short disability benefits associated with a knee injury suffered in late 2018. (Kluxen Decl. ¶ 12; Mausser Dep. 95:24 to 96:24; Garland Decl. Exs. 5 and 17). USI elected not to do so, however. (Kluxen Decl. ¶ 12; Rockman Dep. 202:6-10). Had USI done so, Rockman would have been in a deficit and *owed* USI $4,234.10. (Kluxen Decl. ¶ 12).

On or about April 4, 2019, Fiore called Rockman and told him that USI would send him a final commission payment in the amount of $19,209.30. (Rockman Dep. 210:20 to 211:8). Rockman expressed his appreciation for the Company's decision to pay him this amount, stating

14

in an e-mail to Fiore on April 5, "So good to hear from you with the good news on commission payments." (Garland Decl. Ex. 18). During the following week, on April 12, Fiore followed up with Rockman by e-mail with a commission statement and advised him that the payment would be included in the May 3, 2019 payroll. (Rockman Dep. 153:18-23; Fiore Dep. 142:10 to 143:11; Garland Decl. Ex. 19). In his e-mail response, Rockman thanked Fiore, writing, "[a]ppreciate all you have done to make this happen." (Rockman Dep. 159:7-14; Garland Decl. Ex. 20). On or about May 3, 2019, Rockman received a commission payment in the amount of $19,209.30. (Rockman Dep. 154:6-9, 213:18 to 214:24; Garland Decl. Exs. 21 and 22).

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of Federal Rule of Civil Procedure 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable [fact finder] could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To avert summary judgment, Rockman may not rely on conclusory allegations, conjecture and speculation, but instead must proffer "evidence on which the [fact finder] could reasonably find for the plaintiff." *Id.* at 252; *see also Jantz v. Emblem Health*, No. 10 Civ. 6076 (PKC), 2012 WL 370297, at *11 (S.D.N.Y. Feb. 6, 2012) (dismissing employment discrimination claims because "'conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment.'") (citation omitted). Thus, even "[w]here plaintiff only creates a weak issue of fact (when 'abundant and uncontroverted independent evidence' is to the contrary),

Firm:50493477

summary judgment is still appropriate." *Sheridan v. New York Life Inv. Mgmt., LLC*, No. 09 Civ. 4746 (KBF), 2012 WL 474035, at *4 (S.D.N.Y. Feb. 9, 2012) (quoting *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000)).  Applying this standard here, summary judgment should be entered and the First Amended Complaint should be dismissed in its entirety.

## ARGUMENT

### I.     ROCKMAN'S AGE DISCRIMINATION CLAIMS UNDER THE ADEA AND THE NYSHRL FAIL BECAUSE HE CANNOT PROVE THAT AGE WAS THE 'BUT-FOR' CAUSE OF HIS TERMINATION

#### A.     The "But-For" Standard and Burden Shifting Framework Under the ADEA and NYSHRL

Age discrimination claims brought under the ADEA and the NYSHRL are analyzed under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Gorzynski v. Jet Blue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) ("[W]e remain bound by . . . the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit.") (citations omitted); *DiGirolamo v. MetLife Grp., Inc.*, 494 F. App'x 120, 122 (2d Cir. 2012) (applying framework to NYSHRL). Within this framework, Rockman has the initial burden of establishing a *prima facie* case of age discrimination by showing that (1) he is a member of a protected group, (2) he was qualified for the position at issue, (3) he was terminated, and (4) the termination occurred under circumstances giving rise to an inference of discrimination. *Spence v. Maryland Casualty Co.*, 995 F. 2d 1147, 1155 (2d Cir. 1993) (citing cases).

If Rockman satisfies his initial *prima facie* burden, then USI need only articulate a legitimate, non-discriminatory reason for the adverse employment action. *Jetter v. Knothe Corp.*, 324 F.3d 73, 75-76 (2d Cir. 2003) (affirming summary judgment on ADEA claims where the employer-defendant proffered evidence that it had altered the plaintiff's working conditions for

business reasons not related to age).  Following the U.S. Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc.*, it then becomes Rockman's burden to "prove by a preponderance of the evidence … that age was the 'but-for' cause of the challenged employer decision."  557 U.S. 167, 177-78 (2009) (citation omitted).  *See, e.g., Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 574 (S.D.N.Y. 2010) (granting summary judgment where the plaintiff failed to adduce sufficient evidence to show age was the "but for" cause of his termination); *Sheridan*, 2012 WL 474035, at *9 (granting summary judgment on age discrimination claims where there was "no issue of material fact that age was the sole reason . . . for any alleged adverse employment action.").

As the Supreme Court explained in *Gross*, "[t]he burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision."  *Gross*, 557 U.S. at 180.  In other words, under the ADEA and NYSHRL, it is not enough to show that age was *a* motivating factor in the adverse employment decision; it had to have been *the* motivating factor.  *Id.* at 174, 175 (finding that "[u]nlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor" and thus does not "authorize[] a mixed-motives age discrimination claim").  Rockman cannot meet this rigorous standard because no evidence exists upon which a reasonable fact finder could determine that USI terminated his employment because of his age.

### B.      Rockman Cannot Establish a *Prima Facie* Case of Age Discrimination

As an initial matter, Rockman cannot meet his *prima facie* burden because he cannot establish that his termination occurred under circumstances creating an inference of discrimination.  Rockman relies upon three allegations to support an inference of age discrimination: (1) following the loss of the L3 account, "[USI] began searching for alternative accounts and/or positions for every member of the L3 team but [him]" (Compl. ¶ 17); (2) "USI

17

had no reason to exclude [him] from [its] efforts to continue employing the L3 team members other than [his] age" (Compl. ¶ 19); and (3) "upon information and belief, [USI] did in fact place all other members of the L3 team with other accounts and continued their employment past [his] termination (Compl. ¶ 20).  These allegations are insufficient, as a matter of law, to establish a *prima facie* case of age discrimination.

### 1.  USI Made Efforts to Continue to Rockman's Employment

With respect to the first two allegations Rockman relies upon to support an inference of age discrimination, it is undisputed that USI did make efforts to find other employment for him following the loss of the L3 account, and thus did not exclude him, for any reason, from its efforts to continue employing all members of the L3 team.  But even if USI had not tried to find an alternative role for Rockman, that would still be insufficient to establish a *prima face* case of age discrimination. *See Stanojev v. Ebasco Servs., Inc.*, 643 F.2d 914, 920 (2d Cir. 1981) ("[t]here was no basis for blaming management with [age] discrimination because it did not create another new position for [the plaintiff] in order to continue him on the payroll"); *Faldetta v. Lockheed Martin Corp.*, No. 98 CIV. 2614 (RCC), 2000 WL 1682759, at *10 (S.D.N.Y. Nov. 9, 2000) (granting summary judgment for the employer where its failure to consider the plaintiff for another position prior to terminating his employment did not evince a discriminatory animus toward his age). Thus, even though it is undisputed that USI made efforts to continue Rockman's employment, and no admissible evidence suggests that USI excluded Rockman from such efforts based on his age, USI's failure to consider Rockman for another role would not have established an inference of age discrimination.

### 2.  USI Made Efforts to Continue the Employment of Other L3 Team Members

Rockman's inaccurate surmise that all other members of the L3 team were placed in alternative roles is likewise insufficient to establish a *prima facie* case of age discrimination. A

18

plaintiff can raise an inference of age discrimination by showing that he (1) was similarly situated to other younger employees, and (2) he was treated less favorably than those employees. *See Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014). While a "comparator" does not need to be identical to the plaintiff, he or she must be "similarly situated in all material respects." *Id.* In determining whether employees are similarly situated, their "positions, job responsibilities, and reporting structures are relevant." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 21-22 (E.D.N.Y. 2015) (citing *Shaw v. McHugh*, No. 12-Civ-6834 (CS), 2015 WL 1400069, at *9 (S.D.N.Y. Mar. 26, 2015)); *see also Shaw*, 2015 WL 1400069, at *9 ("Distinctions in assignment, reporting structure, responsibilities and workplace standards undercut [the plaintiff's] argument that his comparators are similarly situated."); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 226 (E.D.N.Y. 2010) (proffered comparators had "marked differences" in job responsibilities).

No admissible evidence shows circumstances here giving rise to an inference of discrimination, as Rockman cannot establish that USI treated *similarly situated* younger workers more favorably than him. Rather, it is undisputed that Fiore, Kelly, Mohindra and Lora held *different* positions than Rockman, did not perform the same duties and functions as him, and were subject to completely different compensation arrangements. It is also undisputed that USI decided to terminate the employment of Mohindra, age 39, because of the loss of the L3 account (but she resigned before USI executed on that decision).

### C.   USI Has Articulated A Legitimate, Non-Discriminatory Reason for Rockman's Termination

Even assuming, *arguendo*, that Rockman could establish a *prima facie* case of age discrimination (and he cannot), USI has rebutted any inference of discrimination with its proffered legitimate, non-discriminatory reason for its decision to terminate Rockman's employment: its loss of the L3 account and its resulting inability to sustain Rockman's significant compensation level.

19

USI's financial analysis of the impact on Rockman's compensation and draw is undisputed, namely that Rockman's draw would have decreased from $252,651 to approximately $5,000 annually.  *See Downey v. Adloox, Inc.*, 789 F. App'x 903, 905-06 (2d Cir. 2019) (affirming summary judgment where the plaintiffs' failure to generate sales or sales leads was a legitimate, non-discriminatory reason for their termination).

### D.       No Evidence Would Allow a Reasonable Fact Finder to Conclude that Age Was the "But-For" Cause of Rockman's Termination

Given that USI has established a legitimate, non-discriminatory reason for Rockman's termination, he can only avert summary judgment by showing "that age was 'the "but-for"' cause of the challenged adverse employment action and not just a contributing or motivating factor.'" *Hu v. UGL Servs. Unicco Operations Co.*, No. 13 Civ. 4251 (LGS), 2014 WL 5042150, at *4 (S.D.N.Y. Oct. 9, 2014) (citation omitted); *see also Chapotkat v. Cnty. of Rockland*, 605 F. App'x 24, 26 (2d Cir. 2015) ("[t]o resist summary judgment on an ADEA claim successfully, a plaintiff must demonstrate that a reasonable [fact finder] could conclude by a preponderance of the evidence that the employer's explanations were pretextual and that, but for the plaintiff's age, the employer would not have taken the action it did.") (citation omitted).  In *Fox v. N.Y.C. Dep't of Educ.*, No. 13-CV-3204(VEC), 2015 WL 4991878, at *13 (S.D.N.Y. Aug. 20, 2015), this Court granted the defendant's motion for summary judgment on the plaintiff's age discrimination claim where the plaintiff "adduced no evidence from which a reasonable factfinder could conclude that the [d]efendant's stated reason for suspending and terminating [the plaintiff] was pretext to disguise a discriminatory motive." (footnote omitted).  Similarly, in this case, no evidence shows by a preponderance of the evidence that *but for* Rockman's age, USI would not have terminated his employment.

For the same reason that Rockman's speculation is insufficient to carry his *prima facie* burden, it is also insufficient to carry his burden to show pretext.  Rockman's discrimination claim rests on nothing more than his conjecture that USI terminated his employment because of his age. As Rockman testified at his deposition, "I can't point the finger at someone and say he . . . wanted to get rid of me because I was old . . . I mean, I don't know why it was me. . . I don't get it." (Rockman Dep. 179:18 to 180:14). Moreover, without any basis in the record, Rockman *assumes* that USI made no efforts to continue his employment and *assumes* that all other members of the L3 team were placed in alternative roles.  As the court recognized in *Hu*, such conclusory allegations are insufficient to satisfy the plaintiff's burden to establish pretext.  *Hu*, 2014 WL 5042150, at *6. ("'[t]he plaintiff's belief that [he] has been the victim of age discrimination cannot defeat a motion for summary judgment in the absence of any corroborating evidence.'") (citations omitted).[7]

Finally, Rockman's assertion that age was the reason for his termination is belied by the undisputed evidence, which demonstrates that age played absolutely no role in the decision to terminate his employment.  (*See supra* pp. 8-12).  Not only was his age not discussed, but Mausser testified that if the L3 account had not been lost, Rockman (now 82 years old) would still be employed by USI.  Accordingly, Rockman's age claim under the ADEA and NYSHRL should be dismissed.  *See Sheridan*, 2012 WL 474035, at *9 (finding the plaintiff's evidence too weak to support a claim of pretext and "[i]n the face of a record of real performance issues, there is only one way that a reasonable [fact finder] could come out on this case:  no liability.").

---

[7] *See also Schwartz v. York Coll.,* No. 06-cv-6754, 2011 WL 3667740, at *7 (E.D.N.Y. Aug. 22, 2011) (granting summary judgment on ADEA claims where allegations of pretext were "unsupported by credible, admissible evidence beyond [plaintiff's] own conjecture, speculation, and opinion."); *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 386 (S.D.N.Y. 2007) (the plaintiff's "subjective belief that he was not treated fairly is simply not enough to demonstrate pretext.") (citation omitted).

Firm:50493477

## II.      ROCKMAN'S AGE DISCRIMINATION CLAIM UNDER THE NYCHRL ALSO FAILS

Age discrimination claims under the NYCHRL are also subject to the *McDonnell Douglas* burden-shifting analysis, pursuant to which a plaintiff must establish a *prima facie* case of discrimination, at which point the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Arnow v. Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 486 (S.D.N.Y. 2013). Under the NYCHRL, "the 'but-for' causation standard does not apply to age discrimination claims," but rather the NYCHRL "requires only that a plaintiff prove that age was 'a motivating factor' for an adverse employment action." *Weiss v. JPMorgan Chase & Co.*, No. 06-civ-4402, 2010 WL 114248, at *1 (S.D.N.Y. Jan. 13, 2010); *see also Teasdale v. N.Y.C. Fire Dep't, FDNY*, 574 F. App'x 50, 51 (2d Cir. 2014). Even under this more lenient, mixed-motive standard, Rockman's age discrimination under the NYCHRL still fails because, as set forth above, no evidence shows that his age played any role whatsoever in USI's decision to terminate his employment. *Rodriguez v. City of New York*, No. 09-civ-1378 (KAM) (RER), 2011 WL 3610751, at *12 (E.D.N.Y. Aug. 16, 2011), *aff'd*, 484 F. App'x 637 (2d Cir. 2012) (granting the defendant's motion for summary judgment on the plaintiff's age discrimination claim under the NYCHRL where the record established that age was not a motivating factor in defendant's decision to terminate plaintiff's employment).

## III.     ROCKMAN CANNOT ESTABLISH A CLAIM FOR UNTIMELY PAYMENT OF COMMISSIONS UNDER THE NEW YORK LABOR LAW

The record does not support Rockman's claim under Sections 191(1)(c) and 191(3) of the New York Labor Law ("NYLL") that USI failed to timely pay Rockman his final commission payment. To the contrary, the evidence makes clear that USI did not owe Rockman any further commission payments following the termination of his employment, and thus Rockman has no

basis to invoke the protections of the NYLL to argue that a payment USI made to him was "untimely."

Rockman alleges in the Fourth Cause of Action in the First Amended Complaint that USI "failed to timely pay [him] all earned commissions in accordance with New York Labor Law §§ 191(1)(c), (3)."  (Compl. ¶ 46).  At his deposition, he explained that he is referring to the payment which USI volunteered to pay him following the termination of his employment.  (Rockman Dep. 150:5-19).

Section 191 of the NYLL governs the frequency at which employers must pay certain classes of employees, including commission salespersons.  Section 191(1)(c) provides, in relevant part:

> A commission salesperson shall be paid the wages, salary, drawing account, commissions and all other monies ***earned or payable in accordance with the agreed terms of employment***, but not less frequently than once in each month and not later than the last day of the month following the month in which they are earned; provided, however, that if monthly or more frequent payment of wages, salary, drawing accounts or commissions are substantial, then additional compensation earned, including but not limited to extra or incentive earnings, bonuses and special payments, may be paid less frequently than once in each month, but in no event later than the time provided in the employment agreement or compensation plan.

(NYLL § 191(1)(c) (emphasis added)).

Section 191 of the NYLL sets forth the timing of the payment of "earned [commissions] payable in accordance with the agreed terms of employment" following the salesperson's termination of employment: "the employer shall pay the wages not later than the regular pay day for the pay period during which the termination occurred." (NYLL § 191(3)).[8]

---

[8] If an employee establishes a violation of Section 191 of the NYLL, his remedies are set forth in NYLL Section 198(1-a).  Pursuant to Section 198(1-a), an employee who prevails on his wage claim shall "recover the full amount of the underpayment, all reasonable attorneys' fees, prejudgment interest . . . and, unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as

Sections 191(1)(c) and 191(3) of the NYLL do not apply here.  First, under "the agreed terms of employment," as set forth in the Employment Agreement, USI did not have to make *any* additional commission payment to Rockman.   Section 3.4 of the Employment Agreement expressly stated that Rockman "shall not be eligible to earn or receive any commissions received by the Company *after [he] is no longer employed*." (Garland Decl. Ex. 4 at p. 8)  (emphasis added)).  The same section of the Employment Agreement further provided that "if [Rockman's] employment hereunder is terminated for any reason . . . the Company shall calculate commissions earned by [him] *and received by the Company prior to [his] termination*."  (*Id.* (emphasis added)).  Thus, under the plain language of the statute, Rockman has not established an unlawfully late payment pursuant to the "agreed terms of [his] employment."

In support of his NYLL claim, Rockman also relies on the provision from his termination letter stating that "[t]he Company has agreed to pay you for commissions earned prior to your last day" and that "[e]arned commissions in the excess of any offsets will be payable as soon as they can be reasonably calculated, but no later than sixty (60) days after being received." (Compl. ¶ 23; Rockman Dep. 144:18-22; Garland Decl. Ex. 11) (emphasis added).  This language, however, is immaterial for purposes of Rockman's NYLL claim, because it does not constitute the parties' "agreed terms of employment" with respect to the payment of commissions pursuant to Section 191(1)(c) of the NYLL.  Rather, it constitutes an entirely separate arrangement, independent of the terms of Rockman's Employment Agreement, under which USI made a unilateral decision to voluntarily pay Rockman commissions (subject to appropriate offsets) that it did not contractually owe him, and for which Rockman provided no consideration.  Therefore, Rockman should not be permitted to exploit USI's good faith generosity in order to recover damages under the NYLL.

---

liquidated damages equal to one hundred percent of the total amount of the wages found to be due." NYLL § 198(1-a).

Even assuming, *arguendo*, that USI's decision to pay Rockman "[e]arned commissions in the excess of any offsets" within "sixty (60) days after being received" could be considered the parties' "agreed terms of employment" under Section 191(1)(c) of the NYLL, which it cannot, USI would have fulfilled its obligations under the statute. This is because had USI paid Rockman in accordance with the language set forth in his termination letter, and offset his commission payment by the $23,443.40 USI paid him in short-term disability benefits, he would not have received *any* commission payment and, in fact, would have *owed* USI $4,234.10.  If there is no commission "payable" under Section 191(1)(c), then it follows that there is no payment to be deemed "untimely" under the statute.

Accordingly, summary judgment should be entered on this claim as well.

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

For all the foregoing reasons, USI respectfully submits that the Court should grant summary judgment for USI and dismiss the First Amended Complaint in its entirety.


Dated: New York, New York
       October 23, 2020

EPSTEIN BECKER & GREEN, P.C.

By:  */s/ David W. Garland*
     David W. Garland
     Carrie E. Anderer
875 Third Avenue
New York, New York  10022
dgarland@ebglaw.com
canderer@ebglaw.com
(212) 351-4500
*Attorneys for Defendant*
*USI Insurance Services LLC*

Firm:50493477